## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | : |
| | : |
| Plaintiff, | : |
| | : |
| v. | : |
| | : |
| ERIC J. McPHAIL, | : |
| DOUGLAS A. PARIGIAN, | : |
| JOHN J. GILMARTIN, | : |
| DOUGLAS CLAPP, | : |
| JAMES A. DROHEN, | : |
| JOHN C. DROHEN, and | : |
| JAMIE A. MEADOWS, | : |
| | : |
| Defendants. | : |

Civil Action No.

JURY TRIAL DEMANDED

## COMPLAINT

Plaintiff Securities and Exchange Commission (the "Commission") alleges the following against Defendants Eric J. McPhail ("McPhail"), Douglas A. Parigian ("Parigian"), John J. Gilmartin ("Gilmartin"), Douglas Clapp ("Clapp"), James A. Drohen ("Andy Drohen"), John C. Drohen, and Jamie A. Meadows ("Meadows").

## PRELIMINARY STATEMENT

1.     This insider trading case concerns McPhail's exploitation of a close personal relationship with a senior executive of American Superconductor Corporation ("AMSC") in order to serially tip material nonpublic information about AMSC to at least six individuals, most of whom were fellow competitive amateur golfers in the New England area.

2.     McPhail's source of inside information was, at all relevant times, a member of AMSC's senior management (and is referred to herein as the "AMSC executive"). McPhail and

the AMSC executive became friends as members of the same country club.  They frequently played golf and socialized together, both at and away from the club.  As part of this relationship, they often shared personal confidences about work and family life.

3.      From at least July 2009 through April 2011, McPhail misappropriated material nonpublic information—concerning AMSC quarterly earnings, contracts and other major corporate developments—disclosed to him in trust and confidence by the AMSC executive. McPhail repeatedly tipped the yet-to-be released news about AMSC to other golfing friends with whom he stayed in regular contact through a group email chain.  This group included Parigian, Gilmartin, Clapp, Andy Drohen and John Drohen.  McPhail also tipped Meadows, a close friend from college.   At various times, these individuals traded in AMSC securities based on the material nonpublic information provided by McPhail, profiting by more than $554,243.

4.      A significant portion of such ill-gotten gains resulted from Parigian's and Meadows' trading around an April 5, 2011 announcement by AMSC that its fourth quarter and fiscal year-end financial results would be lower than expected due to a deteriorating relationship with its primary customer, Sinovel Wind Group Co., Ltd. ("Sinovel").  McPhail had forewarned both Parigian and Meadows of the negative news a few days prior to AMSC's announcement. This enabled Parigian and Meadows to place sure bets (through the purchase of option contracts) that AMSC's stock price would soon fall.  After the company's April 5, 2011 announcement, the stock price did just that—plummeting 42 percent.  As a result, Parigian made profits and avoided losses of $278,289, while Meadows made profits of $191,521.

5.      The numerous emails evidencing this insider trading scheme show that McPhail expected to, and in fact did, receive a benefit from passing along the material nonpublic information he learned from the AMSC executive.  In one such email, which included a tip about

a significant contract and positive quarterly earnings for AMSC, McPhail wrote to Parigian and James Drohen:  "I like Pinot Noir and love steak …. looking forward to getting paid back.  Good Luck …. SHHHHHHHHHHHHH!!!!!!!!!!!!!!!!!!"

6.      By knowingly or recklessly engaging in the conduct described in this Complaint, each of the Defendants violated and, unless enjoined and restrained, will continue to violate Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. § 78j(b)] and Rule 10b-5 [17 C.F.R. § 240.10b-5] thereunder.

## JURISDICTION AND VENUE

7.      The Commission brings this action pursuant to Sections 21(d) and 21A of the Exchange Act [15 U.S.C. §§ 78u(d), 78u-1].

8.      This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1331, and Sections 21(d), 21(e), 21A, and 27 of the Exchange Act [15 U.S.C. §§ 78u(d), 78u(e), 78u-1, and 78aa].  The Defendants have directly or indirectly made use of the means or instrumentalities of interstate commerce, or of the mails, or the facilities of a national securities exchange in connection with the acts, practices, transactions, and courses of business alleged in this Complaint.

9.      Venue in this district is proper under 28 U.S.C. § 1391(b) and Section 27 of the Exchange Act [15 U.S.C. § 78aa] because the acts, practices, transactions and courses of business constituting the alleged securities law violations occurred in substantial part within this district and because all Defendants, other than John Drohen, reside in this district.

## DEFENDANTS

10.      **Eric J. McPhail,** age 40, is a resident of Waltham, Massachusetts.  During the relevant period, he worked for a stone fabrication company.

11.     **Douglas A. Parigian,** age 55, is a resident of Lowell, Massachusetts.  Parigian is an attorney and friends with McPhail as well as one or more of the other Defendants.

12.     **John J. Gilmartin,** age 43, is a resident of Andover, Massachusetts.  Gilmartin is friends with McPhail as well as one or more of the other Defendants.

13.     **Douglas Clapp,** age 47, is a resident of Walpole, Massachusetts.  Clapp is an attorney and friends with McPhail as well as one or more of the other Defendants.

14.     **James A. ("Andy") Drohen,** age 42, is a resident of Granville, Massachusetts. Andy Drohen is friends with McPhail, as well as one or more of the other Defendants, and is the brother of John Drohen.

15.     **John C. Drohen,** age 44, is a resident of Cranston, Rhode Island.  John Drohen knows McPhail, as well as one or more of the other Defendants, and is the brother of Andy Drohen.

16.     **Jamie A. Meadows,** age 40, is a resident of Springfield, Massachusetts. Meadows attended college with McPhail and they have been close friends ever since.

## **RELEVANT ENTITIES**

17.     American Superconductor Corporation is headquartered in Devens, Massachusetts. Its common stock is publicly traded on the NASDAQ under the symbol "AMSC."  During the relevant time, AMSC provided hardware and software for the wind power industry.  AMSC's fiscal year begins on April 1 and ends on March 31.

18.     Sinovel Wind Group Co., Ltd. is a Chinese company engaged in the development, design, manufacturing and sale of wind turbines.  From at least fiscal year 2008 through 2010, Sinovel was AMSC's primary customer, and AMSC's sales to Sinovel generated approximately 67-70 percent (%) of AMSC's revenues.

## FACTUAL ALLEGATIONS

### A.      McPhail and the AMSC Executive Shared a Relationship of Trust and Confidence.

19.      At all relevant times, McPhail and the AMSC executive shared a relationship of trust and confidence.

20.      McPhail and the AMSC executive initially became friends as members of the same country club.

21.      By 2009, McPhail and the AMSC executive had developed a particularly close bond, communicating almost daily and playing golf or otherwise socializing together on a regular basis.  When McPhail, who joined the club after marrying a member, was getting a divorce and in jeopardy of losing his membership, the AMSC executive successfully petitioned the club president to allow McPhail to remain a member.  Another time, the AMSC executive paid off a $6,000 gambling debt for McPhail.

22.      In the context of this relationship, McPhail and the AMSC executive exchanged intimate and confidential details about their personal and professional lives, relying on each other for support and advice.  Among other things, McPhail confided in the AMSC executive about his divorce and the terminal illness of a family member.  Among other things, the AMSC executive shared with McPhail the stresses of his job as a senior officer at a public company.

23.      In the context of this relationship, from time to time, the AMSC executive and McPhail discussed AMSC's stock price and prospects.  These conversations usually centered on the AMSC executive's desire to cash out his holdings of AMSC stock and options if the share price reached a certain target, in order to fund an early retirement from the company.

24.      McPhail knew the AMSC executive held a senior position at AMSC and had access to high level, confidential and sensitive information about the company.

25.     The AMSC executive shared confidential information with McPhail because he believed McPhail would maintain its secrecy.  The AMSC executive understood that McPhail did not trade AMSC stock and, given their relationship of trust and confidence, the AMSC executive was comfortable talking about his company's prospects with McPhail.  When McPhail elicited information about quarterly earnings or other significant corporate news, the AMSC executive perceived McPhail's interest in AMSC's business merely as interest in the AMSC executive's life.

26.     Based on their history, pattern, and practice of sharing confidences, McPhail knew or reasonably should have known the AMSC executive expected McPhail to maintain the confidentiality of the material nonpublic information communicated to him by the AMSC executive.

**B.      McPhail Misappropriated Material Nonpublic Information From the AMSC Executive By Tipping the Information to Others, with the Knowledge and Intent that the Information Would be Used to Trade Illegally.**

27.     In breach of the duty of trust and confidence he owed the AMSC executive, McPhail repeatedly misappropriated quarterly earnings information and other sensitive business information about AMSC that he learned from the AMSC executive prior to AMSC's release of the information to the public.

28.     From at least July 2009 through April 2011, McPhail tipped such yet-to-be released news to certain friends (fellow competitive amateur golfers) with whom he regularly communicated as a group via email.

29.     The group email chain served as a forum to exchange information about golf (tournaments, courses, conditions, etc.), as well as other occasional topics.  Parigian, Gilmartin, Clapp, and Andy Drohen were among the usual participants in the email chain.  John Drohen

was often included on the email chain as well.  McPhail and these five Defendants are referred to below as the "Golfing Group" or "Group."

30.     As set forth below, McPhail also separately tipped his close friend Meadows, with whom he socialized on a regular basis and was in frequent contact via telephone and text messaging.

31.     The confidential information McPhail disclosed to his co-Defendants about AMSC's earnings and business was material.  In each such instance, a reasonable investor would have viewed the information as being important to his or her investment decision.

32.     McPhail tipped material nonpublic information about AMSC to his co-Defendants with the knowledge and intent that the information would be used for trading.

33.     McPhail tipped material nonpublic information about AMSC to his co-Defendants with the expectation of receiving a benefit and he in fact benefitted, including by enhanced social status and hospitality.

34.     At various times, set forth below, one or more Defendants traded in AMSC securities while in possession, and on the basis, of material nonpublic information about AMSC provided by McPhail.

35.     In each such instance, the Defendants traded knowing or having reason to know they improperly obtained the information through the violation of a confidence.

36.     The trading Defendants knew or had reason to know that McPhail had access to confidential information about AMSC from someone who was subject to restrictions regarding the use of such information.

37.     As used herein, an "option" is a security that gives the purchaser the right, but not the obligation, to buy (in the case of a "call option") or sell (in the case of a "put option") 100

shares of a company's stock at a certain predetermined price (the "strike price") before a certain

predetermined deadline (the "expiration date").

**C.   McPhail Tipped the Golfing Group About AMSC's Earnings for First Quarter of Fiscal 2009.**

38.     In July 2009, McPhail began disclosing inside information about AMSC via email

to the Golfing Group.

39.     On July 8, 2009, Clapp emailed the Golfing Group about a different company,

stating: "Watch what this penny stock WGRL does tomorrow.  You'll be amazed."

40.     The next day, July 9, 2009, McPhail responded to the Group:  "WOW…… very

nice!  Gotta get that out a little earlier.  Try this one …. AMSC … watch it July 30th."

41.     On the morning of July 10, 2009, Clapp replied to McPhail only, stating: "Really?

I'm interested.  What's the magic of July 31?"  McPhail responded to Clapp later that morning:

"Earnings are being released on the 30th along with some good news.  I dont [sic] know when

that day they are being released, so I would own them prior to that day.  Now is a good time to

buy from what I am told.  Depending on how the market does that day, maybe a 20% jump that

day?"

42.     On the morning of July 10, 2009, another recipient of McPhail's original message

about AMSC replied to the Golfing Group, asking:  "So, AMSC ….. what's the inside scoop on

July 30 Eric?  Do tell ……"  McPhail replied to this individual and the Group about an hour

later:  "I am not allowed to say … trust me if you want.  Just make sure you take note of the

stocks [sic] price before and after the 30th."

43.     Some in the Golfing Group though expressed skepticism about McPhail's

recommendation.  This led McPhail to write the Group on the evening of July 10, 2009 as

follows:

> I will keep my comments to myself …. I was just passing along some information that I have received in the past that has turned out to be fabulous information.  I dont [sic] care if you buy or not .... I was just looking out.  I certainly didnt [sic] pick 4 letters from the alphabet and throw it out there, I certainly am not an expert when it comes to picking stocks, and certainly dont [sic] want my friends to lose their 'hard earned' money.  I will keep all investment information confidential moving forward and let you experts do it yourself.

44.     In response, Andy Drohen emailed McPhail and the rest of the Group later that same evening, stating in part:

> I appreciate your leads and I was just doing my due diligence and if you looked at that attachment about the stock you sent, you'd see that stock looks like a dog as our good buddy Gordon Gecko would say.  So, I'm suppose [sic] to look at this research that clearly says don't buy, and go by my good buddy that says, 'trust me' I can't divulge my info?  Why don't you tell us how much you're in for and why we should get in.  Otherwise it's just as good as a "sure thing" at Wonderland [a local greyhound racing track].

45.     Within a few days, however, the Golfing Group accepted the reliability of McPhail's tip.  For example, on July 12, 2009, Andy Drohen emailed the Golfing Group: "Countdown to stock …… 18 days ….."  And a few days later, on July 15, 2009, Parigian began purchasing AMSC shares.

46.     Over the rest of the month of July, the Golfing Group monitored and corresponded about AMSC's stock price.  During these email exchanges, McPhail continued to not-so-subtly reference his access to inside information.  In an exchange with the Group on July 20, 2009, McPhail wrote:  "Stock was up another 2.61% ($0.67) after hours.  Not a bad day. Stock will open tomorrow at $26.30.  I also just saw that they [AMSC] announced on the 16th that they will be reporting earnings on the 30th.  What took MSN so long to get that info???? HMMMMM."  In another exchange with the Group that same day, McPhail wrote:  "The stock was at $21 when I told you people about it … stock is up 20% since then and the good stuff

hasnt [sic] even happened.  Whats [sic] wrong with that?  I think you may get another 20% jump on the 30th-31st."

47.     A few days later, on July 23, 2009, McPhail emailed the Golfing Group (minus John Drohen) additional information he learned from the AMSC executive:  "I have already spoken to TGM [Parigian] tonight ….. Take this for what it is worth:  AMSC was up another buck today … I spoke to someone ;) who thinks that there is going to be an announcement on the 29th that will bump the stock significantly followed up with release of earnings on the 30th that will bump it again.  Look for 20, 30, 40 percent the middle to end of next week (Wednesday and Thursday)."

48.     That same day, Parigian purchased 100 additional shares of AMSC for $2,635.

49.     The next day, July 24, 2009, Parigian continued to increase his position in the stock by purchasing 400 shares for $10,520, while Gilmartin, Clapp, and Andy Drohen also purchased AMSC shares.   Gilmartin purchased 1,000 AMSC shares for $26,867; Clapp purchased 755 shares of AMSC for $20,167; and Andy Drohen purchased 520 AMSC shares for $13,721.

50.     The next trading day, July 27, 2009, John Drohen purchased 10 AMSC call options (betting that AMSC's stock price would soon rise) for $520.

51.     The following day, the Golfing Group's email discussion of AMSC continued, with Andy Drohen asking: "what's the word on the *inside* for the drop [in AMSC's share price] today?" (emphasis added)  McPhail responded: "No word … think it is some profit taking and a product of the market today.  A nice buying opportunity.  Hold on to your balls tomorrow!!!!!" A few hours later Andy Drohen purchased 1,000 additional shares of AMSC for $26,758.

52.     On July 29, 2009, AMSC issued a press release stating that it had accelerated shipments of wind turbines, increasing the value of one of its contracts with its customers to more than $470 million.

53.     On July 30, 2009, prior to market opening, AMSC announced that its revenues for its first quarter of fiscal 2009 (ended June 30, 2009) had increased 83% over the first quarter of the prior year to a record $73 million.

54.     That morning, shortly after AMSC's earnings announcement, Clapp (who had paid McPhail's entrance fee to an upcoming golf tournament) emailed the Group stating: "Wow!!  When do we get out?  Eric, [the golf tournament] is on me.  No need to bring your checkbook."

55.     On the day of the announcement, AMSC's stock price closed at $32.13 per share, up from $26.28 per share at the close of the previous day's trading, an increase of approximately 22 percent.

56.     That same day, Parigian, Gilmartin, Clapp, Andy Drohen and John Drohen each sold some or all of the AMSC securities they had purchased.

57.     After further email banter among the Golfing Group about AMSC during the course of the day, McPhail wrote that evening:  "Nice profitable day for the boys.  So when should I report in on which restaurant and massage parlor I want to be treated to?"

58.     As a result of their unlawful trading around the July 30, 2009 earnings announcement, Parigian made profits of $9,018, Gilmartin made profits of $6,479, Clapp made profits of $5,059, Andy Drohen made profits of $11,072, and John Drohen made profits of $2,600.

**D.     McPhail Tipped the Golfing Group About AMSC's $100 Million September 2009 Contract with Sinovel and AMSC's Earnings for Second Quarter of Fiscal 2009.**

59.     On September 2, 2009, McPhail emailed Parigian, Gilmartin, Clapp, Andy Drohen and others to describe his round of golf that day.  In this same email, McPhail mentioned that he would be "in the VIP seats at TPC [a professional golf tournament] with my friend [the AMSC executive] ….. hopefully I can learn a thing or 2 from the boys.  If not, *maybe I can get the next big stock tip*." (emphasis added)  In this email, McPhail referred to the AMSC executive by a commonly used short version of his first name.

60.     Indeed, through McPhail, the Golfing Group continued to be privy to information about AMSC's business and financial results prior to AMSC's release of this information to the investing public at large.

61.     On September 28, 2009, McPhail and the AMSC executive attended a Boston Red Sox baseball game together.  After the game, they went to a restaurant for drinks.  During the course of the day and/or night, the AMSC executive, who had recently returned from a business trip in China, shared with McPhail confidential and detailed information about AMSC.  McPhail wasted no time in relaying this information to the Golfing Group.

62.     On September 29, 2009, at 12:38 a.m., McPhail emailed Parigian and Andy Drohen:

> Well boys....went to the Sox game with a friend of mine tonight. He seems to think that AMSC has a $100 million deal with China that should be signed very shortly.  It could be done in the next few days … if it is not done/announced by Thursday, it will not be announced until the week of the 12th because all of China shuts down on vacation for 10 days – starting Friday.   This announcement should spike them close to 10%.  Furthermore, circle October 29th for the next big day…it could/should be as good as the last one, provided the market cooperates that day.
>
> I like Pinot Noir and love steak….looking forward to getting paid

back.

Good Luck …. SHHHHHHHHHHHHH!!!!!!!!!!!!!!!!!!

63.     Parigian responded to McPhail later that morning stating:  "I will take you for a
nice dinner at [a high end steakhouse]."

64.     Andy Drohen also replied to McPhail that morning, copying Parigian, stating in
part: "Very nice…. thinking options this time….."

65.     In further email exchanges that morning, McPhail, Parigian and Drohen also
discussed informing Clapp of the latest inside information about AMSC.  In response to Andy
Drohen's proposal to share the information with yet another friend, McPhail responded:  "I don't
know how safe the info will remain at that point? Thoughts?"  Andy Drohen answered: "Ya, not
sure there, but maybe he's got a safe way to invest.  Not going to get in today I think, but
hopefully tomorrow I'll be in front of computer."

66.     That same day, McPhail separately communicated the new information he learned
from the AMSC executive to both Gilmartin and Clapp.

67.     Both Parigian and Clapp proceeded to purchase AMSC stock during the day.
Clapp purchased 1,085 shares for $33,479, while Parigian purchased 600 shares for $18,516.

68.     After the close of trading on September 29, 2009, AMSC announced that it had
signed a $100 million follow-on contract with Sinovel.

69.     That evening, in responding to an earlier email from McPhail to some of the
Golfing Group, Andy Drohen wrote: "Hope I didn't miss the boat on AMSC though, I saw your
text and the news announcement today, crap!!"  McPhail replied to this email chain later in the
evening:  "Hopefully there are no terrorist attacks between now and the 29th … could be another
bomber of a day.  Similar to the end of July.  I could take 4 of these announcements a year for
the next dozen years."  To which Andy Drohen replied: "Very good ….. I'll get in before the

29th ….. curious to see how it goes tomorrow on the news.  Earnings must be real good on the 29th again!"  McPhail then responded:  "Yup .… and the 4th quarter too.  That should come out in January … so all you boys can pay for those special XMAS gifts that you buy for your wives."

70.     AMSC's stock price rose from a closing price of $30.36 per share on September 29, 2009 to a closing price of $33.54 per share on September 30, 2009, an increase of over nine percent.

71.     On September 30, 2009, Parigian emailed a friend about AMSC's stock, stating: "In yesterday at 30.86.  Out today at 33.00.  Really was not that hard."

72.     Emails exchanged among the Golfing Group that same day indicate that McPhail was keeping a record of the Group's trading profits.  In response to an email from Andy Drohen (copying Parigian, Gilmartin and Clapp) that referenced John Drohen's purchase of AMSC call options, McPhail wrote:  "What month and strike price?  I need to add him to my spreadsheet. Without him, I think the group is up around $100k."  Andy Drohen responded to the email chain less than ten minutes later, adding John Drohen to the message and stating:  "Johnny D, fill these guys in on your options play this time …. and you owe Eric 48%."

73.     Leading up to AMSC's quarterly earnings announcement for the quarter ended September 30, 2009, McPhail continued to encourage his friends to purchase AMSC stock.  For example, in an October 22, 2009 email to Parigian, Gilmartin, Clapp and Andy Drohen, McPhail wrote:  "Certainly looks like today may be a good buying opportunity for AMSC.  T minus 1 week.  Down under 31.  *Don't be sore, buy more* …." (emphasis added)  About a half-hour later, Andy Drohen replied:  "just picked up another 550 shares ….. been watching it."

74.     In a subsequent email dated October 27, 2009, McPhail was even more emphatic: "Had dinner with my buddy tonight.  The release on AMSC is going to be the best yet….there

might be an announcement on a new deal tomorrow too, so get in early and often.  It will hit $40 and will most likely settle back around $37."  Parigian, Gilmartin, Clapp, and Andy Drohen were all addressed on this email.

75.     At 8:57 a.m. on October 29, 2009, the day AMSC's quarterly earnings were set to be released, McPhail again emailed Parigian, Gilmartin, Clapp, and Andy Drohen about AMSC: "Please keep your arms and feet inside …. enjoy the ride!!!"

76.     Prior to the market opening that morning, AMSC announced that its revenues for the second quarter of fiscal 2009 (ended September 30, 2009) had increased 85% over its revenues from the second quarter of fiscal 2008.  The company's stock price closed at $35.34 per share by the end of the day, up nearly 23 percent from its closing price of $28.84 per share on October 28, 2009.

77.     Between September 29, 2009 and October 28, 2009, Parigian, Gilmartin, Clapp, Andy Drohen and John Drohen all purchased AMSC stock or options based on McPhail's September 29, 2009 tips.

78.     As a result of this unlawful trading, Parigian made profits of $8,011, Gilmartin made profits of $17,234, Clapp made profits of $6,789, Andy Drohen made profits of $10,971, and John Drohen made profits of $6,212.

**E.     McPhail Also Tipped Inside Information Concerning AMSC's Earnings for Third Quarter of Fiscal 2009.**

79.     On January 10, 2010, McPhail and the AMSC executive were watching a football game at a local bar.  At some point, they began discussing AMSC's next quarterly earnings announcement.  As he had done the prior two quarters, McPhail misappropriated and tipped his friends material nonpublic information concerning AMSC's financial results.

80.     On January 11, 2010, McPhail emailed Parigian, Gilmartin, Clapp, and Andy Drohen: "Talked to a friend yesterday ... AMSC earnings are out on February 3rd.  Going to be good but not going to crush estimates like the past 2."

81.     On January 19, 2010, AMSC announced that it would report its earnings for the third quarter of fiscal 2009 (quarter ended December 31, 2009) on February 2, 2010.

82.     Leading up to this earnings release date, McPhail continued to update his friends about AMSC.  For example, on Saturday, January 30, 2010, McPhail again emailed the Golfing Group, stating: "I was out with my friend last night ….. the earnings are being released on Tuesday not Thursday!!  Need to own on Monday!!  Numbers are going to be good …. lets just hope the market cooperates."

83.     On February 2, 2010, prior to the market opening, AMSC announced that its revenues for its third quarter ended December 31, 2009 had increased 95% over its third quarter revenues of the previous year and that it had achieved record net income.

84.     Parigian, Clapp, and John Drohen each traded AMSC stock and/or options prior to the February 2, 2010 announcement but did not make any profits.  Despite the positive news, AMSC's stock price declined from a closing price of $39.75 per share on February 1, 2010 to a closing price of $35.69 per share on February 2, 2010.

85.     After the close of trading on February 2, 2010, McPhail updated the Golfing Group via email about a conversation he had with the AMSC executive: "Talked to my buddy a few minutes ago ….. I asked what he thought was the problem.  He said the investors obviously didnt [sic] think a 70% increase was good enough. haha."  McPhail further stated: "I cant [sic] imagine that this isn't going to snap back in the next few days.  They announced a $70 Mil deal this afternoon too."  This led to the following email exchanges among the Group:

| | |
|---|---|
| **Parigian:** | STOP!!!!! |
| **McPhail:** | OK ….. I will keep this info to myself from now on. |
| **John: Drohen** | I'm still listening, tell dougy [Parigian] to stop whining . . . . |
| **McPhail:** | I can only get the *inside info* … can't control if it goes up or down (emphasis added) |

### F. By no later than March 2010, One or More of McPhail's Tippees Knew the Precise Identity of McPhail's Source of Inside Information About AMSC.

86.    The Defendants in the Golfing Group knew, or reasonably should have known, of McPhail's friendship with the AMSC executive.  In disclosing confidential information about AMSC to the Group, McPhail repeatedly made reference to his "friend" who was the source of this information.  The nature of the AMSC information provided by McPhail to the Golfing Group indicated that it emanated from a source within the company.  One or more members of the Group had even met the AMSC executive.  For instance, for several years, Clapp competed against the AMSC executive in an annual golf tournament held at the country club where McPhail and the AMSC executive were both members.

87.    Further, as set forth above, in a September 2, 2009 email, McPhail even referred to the AMSC executive by his first name in an email to the Golfing Group.

88.    By no later than March 2010, Parigian (and likely others in the Group) knew the precise identity of McPhail's source of inside information concerning AMSC, as shown by the emails described below in paragraphs 89-90.

89.    On March 7, 2010, McPhail emailed the AMSC executive, Parigian, Gilmartin, Clapp, Andy Drohen, and several other people inviting them to join an annual trip to the Kentucky Derby organized by McPhail.  After Parigian responded to all that he would be unable to attend the Derby, the AMSC executive, using his AMSC work email address, responded to

Parigian (copying McPhail):  "Doug[,] You don't know me but I'm a good friend of Eric's[.]  I am going to the Derby even though I have to travel to Austria, Naples Florida, and China this month.  But the good news is I am going to bring your driver [a golf club that McPhail had previously borrowed for a trip to Florida with the AMSC executive] back when I return from Naples.  Hope to play golf with you someday; I heard you are almost as confident as me."  Parigian responded to the AMSC executive, thanking him for returning the driver.

90.     On March 16, 2010, Andy Drohen emailed the Golfing Group, asking if "anyone [was] still in AMSC??"  After Gilmartin responded "YES," Andy Drohen asked McPhail: "Eric, care to make a comment?"  McPhail answered:  "No … I haven't looked at it in over a week.  All I know is *he* is coming home from Naples tonight with my clubs." (emphasis added)  Tellingly, Parigian then added "…… and mine," an acknowledgment of his email correspondence with the AMSC executive and his awareness that the AMSC executive was the source of McPhail's inside information about the company.

91.     Parigian later met the AMSC executive in person in August 2010, at a golf tournament held at the country club where McPhail and the AMSC executive were both members.  During the post-tournament dinner, the AMSC executive and Parigian discussed the fact that the executive worked at AMSC.

### G.     McPhail Continued to Provide AMSC Tips During Calendar Year 2010.

92.     Although some of the Golfing Group's enthusiasm about AMSC began to wane after failing to profit off of the company's February 2, 2010 earnings announcement, McPhail continued to misappropriate and tip confidential information about the company throughout the second half of 2010.

93.     On July 22, 2010, Andy Drohen emailed McPhail, copying Parigian, and inquired about AMSC:  "Anything coming out of the wind company at all ….. earnings next week."

94.     As part of his reply email that same day, McPhail indicated that "Earnings will be good."

95.     Then, on July 28, 2010, McPhail emailed Parigian, Gilmartin and Andy Drohen with a further update about this next earnings announcement, stating:  "Just had dinner with my friend … expect to go up 4-5 tomorrow.  Sorry for the delay but don't have a dog in the fight so wasn't too concerned on the news.  Quarterly earnings will beat everything and yearly estimates going up across the board.  Hopefully you guys are still in the game—you will make money tomorrow."

96.     On July 29, 2010, announced that its earnings for the quarter ended June 30, 2010 more than doubled year over year and that it increased its revenue and earnings forecasts for the full fiscal year.  Nonetheless, AMSC's stock price declined from a closing price of $32.72 per share on July 28 to a closing price of $30.55 per share on July 29.

97.     Although none of the Defendants traded in advance of this announcement, Parigian sent McPhail a sarcastic message that evening (copying Gilmartin and Andy Drohen):  "Thanks Buddy.  Any chance you could call your 'friend' and ask him to throw out the anchor to stop this freefall.  Thanks again."

98.     Parigian, however, remained interested in AMSC, soliciting information from McPhail about the company's next earnings report in an email dated October 26, 2010:  "AMSC is announcing quarterly reports on November 2.  Any thoughts?"  McPhail replied that same day, "They are going to be good."

99.     On November 2, 2010, AMSC announced that its revenues for the second quarter ended September 30, 2010 had increased 36 percent over the second quarter of the previous fiscal year.  Parigian purchased AMSC shares that day after the earnings announcement.  The

company's stock price closed at $36.56 per share, up nearly 12.5 percent from its closing price of $32.50 per share the day prior.

100.    The next day, Tuesday, November 3, 2010, McPhail emailed Parigian, Gilmartin and Andy Drohen, warning them to "[g]et out before Monday on stock."  After Andy Drohen asked McPhail "should we be in puts," McPhail responded in part: "Puts are a possibility … He said 'stock will go down, but great for the long term.'"

101.    On November 4, 2010, Andy Drohen emailed John Drohen (copying Parigian), asking:  "How do we make a lot of money with at stock that we think will go down?  Is this when we buy puts?"  After providing an explanation of options trading, John Drohen stated he "almost sold some amsc puts the other day, but decided not to" and asked "what details can you give me?"  Andy Drohen responded:  "All I got was news on Monday to make it go down, but good for the long term…..must be buying someone up."  Parigian also responded to John Drohen, stating:  "Not sure …. But the stock seems awfully high …. If some news were to come out on Monday it might hurt the stock …..  wink."

102.    On Monday, November 8, 2010, after the close of trading, AMSC announced a registered public offering of 4.6 million shares of its common stock.  Such new offerings of stock by a publicly traded company often cause a decrease in the company's stock price.  AMSC's share price dropped from a closing price of $37.24 per share on November 8, 2010 to a closing price of $36.11 per share on November 9, 2010

103.    On Thursday, November 11, 2010, prior to the market opening, AMSC announced the pricing of its common stock offering.  AMSC's share price dropped from a closing price of $36.91 per share on November 10, 2010 to a closing price of $35.48 per share on November 11, 2010.

104.    Parigian, Andy Drohen and John Drohen each made small profits trading around the news of AMSC's secondary offering.

**H.    McPhail Tipped Parigian and Meadows Concerning AMSC's Loss of Business from Sinovel Prior to AMSC's Public Disclosure of this Negative News on April 5, 2011.**

105.    For several years up through its fiscal year 2010 (ended March 31, 2011), AMSC's primary customer was Sinovel.

106.    Because a significant portion of AMSC's revenues were derived from Sinovel, loss of business from Sinovel loomed as a risk to AMSC's financial results and stock price. AMSC disclosed this risk in its public filings with the Commission.  For example, AMSC's Annual Report on Form 10-K for its fiscal year ended March 31, 2010 included the following disclosure:

> Revenue growth in fiscal 2009, 2008 and 2007 was driven largely by our AMSC Power Systems business unit. Our largest customer is Sinovel in China. Sinovel accounted for a majority of our total revenues during these periods. Revenues from Sinovel are supported by purchase orders and contracts for electrical system core components as well as development contracts for the design of wind turbines. If Sinovel cancelled purchase orders or development contracts, or discontinued future purchases from us, we would likely be unable to replace the related revenues. This would have a serious negative impact on our operating results and financial position.

107.    Under the contracts between AMSC and Sinovel, AMSC typically made monthly shipments of products to Sinovel, for which Sinovel would normally pay within 30 days. Starting in approximately September 2010, however, Sinovel missed and/or delayed payments for certain delivered shipments.

108.    During the fourth quarter of AMSC's fiscal year 2010 (ended March 31, 2011), Sinovel requested that AMSC upgrade the technology in certain products and indicated that it may not accept additional shipments without such changes.

109.    During the last week of that quarter, AMSC negotiated with Sinovel over the requested product modifications, the acceptance of approximately $65 million in products scheduled for delivery by March 31, 2011, and the payment of approximately $62 million that Sinovel owed AMSC for previously delivered products.

110.    At approximately 9:00 a.m. on March 31, 2011, the AMSC executive learned that the negotiations with Sinovel had broken down, with Sinovel refusing to accept the contracted shipments ready for delivery and refusing to make any immediate payment of the amounts owed for previously delivered shipments.

111.    The AMSC executive was devastated by this news.  In an internal email sent that morning to another employee with knowledge of the news, the AMSC executive stated:  "We just pushed out success by at least 5 years in my opinion … no money for us in this company now for several years … can see options expiring now for no value … I'm [expletive]."

112.    Later that day on March 31, 2011, McPhail and the AMSC executive exchanged several emails in which the AMSC executive alluded to significant problems at AMSC.  In response to some correspondence among McPhail and other friends, the AMSC executive responded to McPhail only, stating: "I am having a real bad day.  Don't even have the energy to chime in.  I feel like throwing up.  Will need to hit superfecta this year for sure now!!!!  If u know what I mean.  I will be working for a long time now."  McPhail responded: "I am having a terrible day today.  Worst one yet.  Your bad days are worse than mine, but I like the upside of your good days."  The AMSC executive in turn stated:  "No upside in sight for me for over a year ………"

113.    After a brief exchange about McPhail's own work issues, the AMSC executive then added: "Gotta keep reminding myself only health matters …….. so what if I am about to

lose about $890,000 of after tax money …….. my wife and kids are doing fine and I am still healthy enough to work …….." McPhail then attempted to elicit additional information, asking "How so? Stock only down short money." The AMSC executive did not respond further.

114. The next day, Friday, April 1, 2011, McPhail and the AMSC executive met at a bar after work, around 6:00 p.m. The AMSC executive was upset about the situation with Sinovel and, over the course of several drinks, discussed with McPhail that as a result of a big problem at AMSC, the executive stood to lose a lot of money, would be unable to retire early, and instead would have to continue working for a long time.

115. Recognizing the significance of the information the AMSC executive shared with him, McPhail tipped the information to Parigian and Meadows at some point over the course of the weekend of April 1-3, 2011.

116. While still commiserating with the AMSC executive at the bar that Friday evening, McPhail placed a telephone call to Parigian at approximately 8:13 p.m.

117. Parigian in turn called his broker at 8:23 p.m. to confirm that he had options trading privileges in his account.

118. The next morning, Saturday, April 2, 2011, at approximately 8:39 a.m., McPhail called Meadows. After making another call to Parigian, at approximately 10:15 a.m., McPhail drove to Meadows' home in Springfield, Massachusetts, where he spent the night.

119. On Monday, April 4, 2011, at 9:39 a.m., Meadows placed a four minute call to McPhail. At 11:05 a.m., Meadows called his broker and asked how he could make money trading a stock whose share price he believed would drop. The broker explained various alternatives to Meadows, including shorting the stock or buying put options. Meadows immediately applied for options trading privileges for his account. At approximately 1:30 p.m.,

he purchased 300 AMSC put options with an expiration date of May 20, 2011 and a strike price of $20.   AMSC's stock price had opened that day at $24.54 per share.   Meadows' trade effectively was a bet that AMSC's stock price would soon decline.

120.   That same day, beginning at approximately 9:30 a.m., Parigian purchased 238 AMSC put options that expired in April or May 2011 and had strike prices ranging from $21-$23. Parigian also sold his entire remaining position in AMSC, 1,100 shares at the price of approximately $24.31, realizing $26,737.  Parigian purchased 92 additional put options the next day.  Parigian's options trades effectively bet that AMSC's stock price would soon decline.

121.   On April 5, 2011, after the close of trading, AMSC issued an update regarding its anticipated financial results for its fourth quarter and fiscal year ended March 31, 2011.  The public announcement provided, in pertinent part, that:

- Sinovel had refused to accept the March 2011 shipments and AMSC expected Sinovel to reduce its level of inventory before accepting further shipments;

- As a result, AMSC expected its fourth quarter revenues to be less than $42 million and to generate a net loss for the quarter;

- AMSC's yearly revenues would be less than $355 million (as compared with the company's prior forecast for fiscal year 2010 revenues of $430-$440 million);

- AMSC's earnings for fiscal year 2010 would be well below the company's previous forecasts;

- AMSC's cash balance was negatively impacted by Sinovel's failure to pay for certain contracted shipments made in fiscal year 2010; and

- AMSC would be reviewing the appropriateness of the timing of its revenue recognition on approximately $56 million in unpaid shipments in fiscal year 2010.

122.    On April 6, 2011, the day after this public announcement, the price of AMSC's common stock dropped approximately 42 percent (from a close of $24.88 per share on April 5, 2011 to a close of $14.47 per share on April 6, 2011).

123.    By timely selling AMSC shares and purchasing put options the day prior to the company's announcement of negative news, Parigian made profits and avoided losses of $278,289.  In so doing, Parigian traded in AMSC securities while in possession, and on the basis, of material nonpublic information about AMSC provided by McPhail.

124.    By timely purchasing put options the day prior to the company's announcement of negative news, Meadows made profits of approximately $191,521.  In so doing, Meadows traded in AMSC securities while in possession, and on the basis, of material nonpublic information about AMSC provided by McPhail.

125.    The information McPhail provided to Parigian and Meadows about impending financial trouble at AMSC was not publicly known or disseminated at that time; rather AMSC restricted the information about the loss of business from Sinovel to select persons within AMSC and required them to keep the information confidential.

126.    This information was material because it concerned a significant development at AMSC that was going to impact AMSC's financial results and stock price.  A reasonable investor would have viewed this information as being important to his or her investment decision or a significant alteration of the total mix of information made available to the public about AMSC.

### CLAIMS FOR RELIEF

**Violations of Section 10(b) of the Exchange Act and Rule 10b-5 thereunder**

127.     The Commission repeats and incorporates by reference the allegations in paragraphs 1 through 126 above.

128.     At all times relevant to this Complaint, each of the Defendants acted knowingly or recklessly.

129.     By engaging in the conduct described above, the Defendants directly or indirectly, in connection with the purchase or sale of securities, by the use of means and instrumentalities of interstate commerce, or of the mails, or of a national securities exchange:  (a) employed devices, schemes or artifices to defraud; (b) made untrue statements of material facts or omitted to state material facts necessary to make the statements made, in the light of the circumstances under which they were made, not misleading; and/or (c) engaged in acts, practices or courses of business which operated or would operate as a fraud or deceit upon certain persons.

130.     The conduct of the Defendants involved fraud, deceit, manipulation, or deliberate or reckless disregard of regulatory requirements and directly or indirectly resulted in substantial losses to other persons.

131.     As a result, the Defendants violated and, unless enjoined, will continue to violate Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

132.     The Commission's claims for the securities law violations described above are summarized in the following chart:

| CLAIM | INSIDER TRADING | DEFENDANTS | PROFITS / LOSSES AVOIDED |
|---|---|---|---|
| 1 | Trading Around July 30, 2009 AMSC Press Release re First Quarter Fiscal 2009 Financial Results | McPhail Parigian Gilmartin Clapp Andy Drohen John Drohen | Parigian ($9,018) Gilmartin ($6,479) Clapp ($5,059) Andy Drohen ($11,072) John Drohen ($2,600) |
| 2 | Trading Around September 29, 2009 AMSC Press Release re $100 Million Follow-on Contract with Sinovel | McPhail Parigian Clapp John Drohen | Parigian ($1,776) |
| 3 | Trading Around October 29, 2009 AMSC Press Release re Second Quarter Fiscal 2009 Financial Results | McPhail Parigian Gilmartin Clapp Andy Drohen, John Drohen | Parigian ($6,235) Gilmartin ($17,234) Clapp ($6,789) Andy Drohen ($10,971) John Drohen ($6,212) |
| 4 | Trading Around November 8, 2010 AMSC Press Release re Public Offering of Common Stock | McPhail Parigian Andy Drohen John Drohen | Parigian ($328) Andy Drohen ($500) John Drohen ($160) |
| 5 | Trading Around April 5, 2011 AMSC Press Release Updating Fourth Quarter and Fiscal Year 2010 Financial Results | McPhail Parigian Meadows | Parigian ($278,289) Meadows ($191,521) |

## PRAYER FOR RELIEF

WHEREFORE, the Commission requests that this Court enter a final judgment:

A.      Permanently restraining and enjoining Defendants and each of their agents, servants, employees and attorneys and those persons in active concert or participation with them who receive actual notice of the injunction by personal service or otherwise, including facsimile transmission or overnight delivery service, from directly or indirectly engaging in the conduct

described above, or in conduct of similar purport and effect, in violation of Section 10(b) of the

Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5];

   B. Ordering each Defendant to disgorge all ill-gotten gains or unjust enrichment

derived from the activities set forth in this Complaint, together with pre-judgment interest;

   C. Ordering Defendant McPhail to disgorge all ill-gotten gains or unjust enrichment

derived by his direct and indirect tippees as set forth in this Complaint, together with pre-

judgment interest;

   D. Ordering each Defendant to pay civil monetary penalties pursuant to Section 21A

of the Exchange Act [15 U.S.C. § 78u-1];

   E. Retaining jurisdiction over this action to implement and carry out the terms of all

orders and decrees that may be entered; and

   F. Awarding such other and further relief as the Court deems just and proper.

## JURY DEMAND

The Commission hereby demands a trial by jury on all claims so triable.

    Respectfully submitted,

    **SECURITIES AND EXCHANGE COMMISSION**

    By its attorneys,

    /s/ Michael D. Foster
    Michael D. Foster (IL Bar# 6257063)
    Martin F. Healey (BBO# 227550)
    Asita Obeyesekere (DC Bar# 451637)
    33 Arch Street, 23rd Floor
    Boston, MA  02110
    (312) 886-8520 (Foster)
    (617) 573-4590 (Facsimile)
    fostermi@sec.gov

Dated:  July 11, 2014